[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
CORRECTED MEMORANDUM OF DECISION
In this case, plaintiffs John M. Spear ("Spear") and Spear Printing Company, Inc. ("Spear Printing") have sued defendant Summit Medical Center, Inc., f/k/a Summit Women's Center West, Inc. ("Summit"), to recover money damages for certain injuries and losses they claim to have suffered due to Summit's alleged participation in the maintenance against them of a vexatious suit. The plaintiffs complain, more particularly, that from September 22 through December 6, 1989, Summit caused them to endure public humiliation, damaged their reputations, and forced them to incur significant legal expense by maliciously joining with the Town of West Hartford in the prosecution of a federal civil lawsuit entitled Town of West Hartford v. Operation Rescue, et als., Civ. No. H-89-400 (PCD) (D.Conn.) (the "underlying action"), in which they both had been named defendants.
The underlying action grew out of certain unlawful, costly and highly disruptive anti-abortion protests, referred to by their perpetrators as "rescue," which had been conducted at the Summit Women's Center in West Hartford in the Spring of 1989. Brought initially by the Town of West Hartford ("Town"), whose Police Department had responded to the protests and made scores of arrests, the action sought monetary, declaratory and injunctive relief against several persons, organizations and entities, including Spear and Spear Printing, whom the Town accused of conspiring and combining together to mount the protests, in alleged CT Page 5020 violation of the federal Racketeer Influenced and Corrupt Organizations Act ("RICO"),[1] the federal Hobbs Anti-Racketeering Act ("Hobbs Act")[2], and other federal and state statutes.
According to the Town's original Verified Complaint ("V.C.") dated June 29, 1989, Spear and Spear Printing not only conspired with the other defendants and unnamed third persons to mount the protests, but took affirmative action to promote their success by "deliberately and maliciously publishing an inaccurate, defamatory account" of the initial, April 1, 1989 protest in the Orange CountyPost, a Washingtonville, New York newspaper edited by Spear and published by Spear Printing. V.C., ¶ 66. The Town alleged that the plaintiffs wrote and published the challenged account of the initial protest, which falsely accused the West Hartford Police Department of brutality in its treatment of arrested protesters, "in furtherance of the efforts by the defendants and others to harass, intimidate and extort a less diligent or softened response from the West Hartford Police Department for further protest activities by the defendants and others at the Summit Women's Center and elsewhere within the Town of West Hartford." Id.
On July 24, 1989, about one month after the underlying action was commenced, defendant Summit and the National Organization for Women ("NOW"), both then represented by Attorney Anthony F. Slez, Jr., moved jointly to intervene in that action under Rule 24 of the Federal Rules of Civil Procedure.[3] Though Rule 24 expressly provides that any motion to intervene in a federal civil action "shall be accompanied by a pleading setting forth the claim or defense for which intervention is sought," Summit's and NOW's joint motion to intervene was accompanied only by an affidavit from Attorney Slez, who averred that if intervention were permitted, his clients would file an intervening complaint which adopted all the allegations of the Town's Verified Complaint.
On August 24, 1989, United States District Judge Peter C. Dorsey filed his written Ruling On Motion To Intervene ("Ruling"). In the Ruling, Judge Dorsey denied NOW's request to intervene due to the "attenuated" nature of its interests in the subject matter of the underlying lawsuit, and thus to its "remoteness from the particulars of this case." Id., p 6. In that same Ruling, however, Judge Dorsey granted Summit's parallel request to intervene based on both the "direct[ness] and concrete[ness]" of its interests in the lawsuit, on its own behalf and that of its patients, id., pp. 4-5, and the "common[ality]" of factual and legal issues between Summit's claims and those of the Town, as evidenced CT Page 5021 by Summit's avowed "inten[tion] to adopt the current complaint."Id., p. 3.
Thereafter, on September 22, 1989, defendant Summit, acting through new counsel, Attorney Pamela Hershinson, filed an intervening complaint which, with only minor technical changes, adopted all the allegations the Town's original Verified Complaint. By so doing, Summit formally joined the Town in prosecuting the underlying action against Spear and Spear Printing. Later, however, on December 6, 1989, the Town and Summit jointly filed a Second Amended Complaint which, among other things, unilaterally dropped Spear and Spear Printing as defendants from the underlying action. The plaintiffs now claim that by voluntarily withdrawing its claims against them, Summit caused the underlying action to terminate in their favor, and thus formally exposed itself to liability for prosecuting, with malice and without probable cause, what had always been a vexatious civil lawsuit.
Summit has denied that it acted maliciously or without probable cause when it joined the Town of West Hartford in the prosecution the underlying action. It has also denied that by participating in that action, it proximately caused the plaintiffs any loss or injury they would not otherwise have suffered had its motion been denied and the Town proceeded alone.
In addition, Summit has interposed several special defenses.
Its special defenses include the following:
 First Special Defense: As an intervening plaintiff in the federal lawsuit, Summit Medical Center was required by federal rule and precedent to file a "mirror" complaint to that of the Town of West Hartford, and therefore had no control over the inclusion of John M. Spear and Spear Printing Co. in the initial action.
* * * *
 Third Special Defense
The defendant relied upon the advice of its counsel that probable cause existed for both the original action brought by the Town of West Hartford and for the intervening complaint brought by the defendant.
CT Page 5022
 Fourth Special Defense
The intervening complaint was brought in good faith.
 Fifth Special Defense
The defendant's intervening complaint was brought in reliance upon the investigation conducted by the Town of West Hartford, and the representations made by the Town of West Hartford's counsel.
 Sixth Special Defense
The defendant played no role in the decision of the Town of West Hartford to name the plaintiffs in the initial complaint or to seek a preliminary injunction against them.
* * * *
Amended Answer (dated 12/27/94), pp. 2-3.
Finally, Summit has filed a Counterclaim for abuse of process. In it's Counterclaim, it alleges that the plaintiff' principal reason for pursuing this lawsuit has always been to hinder or prevent it from collecting a judgment of $13,453 in attorney's fees, which it was awarded by United States District Judge Alan H. Nevas following tne 1992 dismissal of the plaintiffs' earlier federal civil rights action against it. On that basis, it claims that it is entitled to recover all monies it has spent to date in defending this action.
Upon the plaintiffs' denial of all the allegations of the defendant's special defenses and Counterclaim, the issues of this case were framed for trial. The case was tried before the Court in the summer of 1996. Based upon the testimony and other evidence presented at that time, the Court makes the following findings of fact and conclusions of law.
FINDINGS OF FACT
The Parties
1. John M. Spear is a lifelong resident of Washingtonville, New York, where at all times relevant to this case he has co-owned CT Page 5023 and worked for his family's business, Spear Printing Company, Inc.
2. Spear Printing is a New York corporation that publishes theOrange County Post, a local newspaper with a circulation of approximately 2600 that covers the towns lying within the Chester and Washingtonville (N.Y.) School Districts. In 1989, when the events which gave rise to this case occurred, John M. Spear was Vice President of Spear Printing and the editor of the OrangeCounty Post.
3. John M. Spear has long been a prominent member of the Washingtonville community. Not only does he co-own Spear Printing and edit the Orange County Post, but he serves on the town planning board, directs a youth basketball program that has over 1100 participants, and is an active member of the local Roman Catholic church.
4. John M. Spear is morally opposed to abortion. He conscientiously believes that all abortion is murder and that all persons who perform or facilitate the performance of abortions are murderers.
5. To demonstrate his personal opposition to abortion, John M. Spear has written and published editorials condemning the practice in and for the Orange County Post, and has frequently participated in the annual March for Life in Washington, D.C., where persons opposed to abortion gather together to protest the United States Supreme Court's decision to legalize abortion in Roe v. Wade,410 U.S. 113 (1973). Even so, Mr. Spear has never joined Operation Rescue or any other group or organization on that has worked to stop legal abortions by destroying, blocking access to or otherwise interfering with the operations of clinics where abortions are performed.
6. Defendant Summit Medical Center, Inc., formerly known as Summit Women's Center West, Inc., is a Connecticut corporation which at all times relevant to this case has operated a women's health care facility known as the Summit Women's Center in rented space on the third floor of a shopping center at Bishop's Corner in West Hartford. Among other services made available to its clients, the Summit Women's Center performs legal abortions and provides family planning counselling.
The "Rescues"
CT Page 5024
7. On April 1, 1989, a large number of anti-abortion protesters came to West Hartford and staged a highly disruptive protest at the Summit Women's Center. In the course of the protest, which the protesters termed a "rescue," individual protester, engaged in a wide range of coordinated activities, both inside and outside of the Summit Women's Center, which were designed and intended to shut down the Center and/or to prevent or dissuade the Center's patients from availing themselves of its services. Those activities, which were witnessed by West Hartford Police Chief Robert McCue and approximately 50 other members of his Department, Summit Executive Director Marleisa Montgomery and other members of her staff, and/or West Hartford Assistant Corporation Counsel Patrick Alair, included: jamming the telephone lines of the Summit Women's Center with telephone calls, many of which were threatening and/or obscene; gaining and attempting to gain unwelcome entry into the clinic and its procedure rooms; barricading themselves inside the clinic and refusing to leave when ordered to do so by clinic staff and police; refusing to assist the police in their own removal when asked to do so by the police; actively interfering with the efforts of police to remove themselves and other protesters from the clinic; locking themselves inside the elevators in the common hallways of the building so that the elevators could not be used to remove arrested protesters from the clinic; blocking the right-of-way of motorists and pedestrians on the streets and sidewalks outside the building; and, when buses were brought to the scene to transport arrested protesters to jail, crawling underneath the buses so they could not be driven away. As a result of this protest, the Summit Women's Center was shut down for one-half day.
8. Most of the protesters who were arrested as a result of the April 1, 1989 "rescue" refused to identify themselves by name. One, however, a woman who was arrested while trying to interfere with police efforts to remove other protesters from inside the clinic, identified herself as Catherine A. Jersey, and said that she was "from the press." In fact, Catherine Jersey was employed at the time by Spear Printing Company, where she worked as a typographer under the supervision of John M. Spear, on the publication of the Orange County Post. Notwithstanding the implication of her statement that she was attending and participating in the April 1, 1989 "rescue" at the behest of her employer, Ms. Jersey involved herself in the "rescue" entirely on her own, without the advance knowledge or approval of Mr. Spear or Spear Printing Company. CT Page 5025
9. On June 17, 1989, an even larger group of anti-abortion protesters, again including Catherine A. Jersey, came to West Hartford and staged a second, even more disruptive protest at the Summit Women's Center. This second protest or "rescue," which was witnessed by the same West Hartford officials and police officers and Summit staff members as the first, involved many of the same types of coordinated protest activities, both inside and outside the Summit Women's Center, as had taken place on April 1, 1989. In addition, however, it involved the intentional destruction of literature, doors and medical equipment inside the clinic. The June 17, 1989 "rescue," like its predecessor, required a massive response by the West Hartford Police Department and resulted in the arrest of scores of uncooperative protesters, most of whom refused to divulge their names when they were taken in to custody. As a direct result of this second protest, the Summit Women's Center had to be shut down for nearly one week so that soiled equipment could be cleaned and broken doors, fixtures and instruments could be repaired or replaced.
The Response of Plaintiffs Spear andSpear Printing to the "Rescues" at Summit
10. On April 3, 1989, when Catherine A. Jersey returned to Washingtonville from West Hartford, she and fellow "rescuer" William Waugh spoke to John M. Spear about the events of April 1, 1989. In particular, they told Mr. Spear that when they and other rescuers had attempted to engage in peaceful, non-violent protest activities, including sidewalk counselling of women seeking to avail themselves of Summit's services, they were arrested and brutally mistreated, first by members of the West Hartford Police Department, and later by courthouse personnel responsible for detaining them before they appeared in court.
11. Incensed by what he had been told, and wishing to inform the public about it, John M. Spear promptly wrote an editorial entitled "Northern Red Necks," which was published the very next day in the Orange County Post. The editorial, in its entirety, read as follows:
 There was a rescue in West Hartford, Connecticut over the weekend that may become famous in history. It was a day when all the civil rights of those arrested were suspended, when torture, physical injury and abuse were the norm of the day — and some of it was done CT Page 5026 right in a court room in front of a judge who apparently approved of what was done.
 Of course, we have to realize that those arrested are very, very dangerous and their aim is radical — after all, they are trying by non-violent means to keep unborn children from being killed. And since unborn children have no rights at all, it is only logical that those who are trying to protect the most innocent and helpless of the citizens of the United States will have no rights either. Others, while being arrested, even had the audacity to pray — and were subjected to further abuse and torture when they did so. A terrible crime, praying to God.
 That was the case over the weekend. Murderers, drug pushers, others of their ilk have their rights protected to the nth degree. But these dangerous, radical protestors, who block the entrance to abortion mills, to stop the killing going on inside for a day and give women a chance for second thoughts about killing their babies, these people have no rights.
 What happened? At least five rescuers had bones broken by the West Hartford Police and were denied medical attention until the attorney for those arrested had a doctor visit with those imprisoned to determine if medical attention was necessary. Three people were then taken to a local hospital — 32 hours after the injuries were inflicted. Many of those arrested had their hands bound behind their backs with oversized cable ties (large plastic straps that can be pulled excessively tight) and then carried or dragged by these straps. One woman with a heart condition had her hands tied so brutally tight that they turned blue. People passed out from the beatings and the pain inflicted by the police. Twenty-three of the rescuers, including a retired 73-year-old Catholic auxiliary bishop, CT Page 5027 were forced to stay for two nights in a courtroom building without bedding or blankets and with the air conditioning turned on to drop the room temperature even more. Fingers were bent over backward till they touched the arm. A man with a dislocated bone had his arm twisted by the police in the courtroom in front of the judge. In this case, justice was definitely blind because nothing was said and it was permitted to go on. And all this took place in front of large numbers of people. To top it all off, the police chief, right in front of a group of those arrested, told them they got what they deserved. It should also be mentioned here that the police who inflicted the torture first removed their badges and name tags and refused to give their names to those arrested. When asked later why they removed their badges, the police chief said it was to protect those arrested, to prevent them from getting scratched!
 When some southern police departments used similar tactics during the civil rights movement in the 1960's, the mass media couldn't get enough coverage in print and on the air. We were bombarded with reports, columns, editorials, commentaries on a daily basis. Yet, with the exception of a few local news outlets, the mass media now seems to have no eyes or ears. The silence is ominous.
 Politicians who bend over backward to protect the civil rights of drug pushers, murderers or others like them, they, too, remain critically silent. All, of course, are hiding under the guise that it is legal to kill unborn children and so it becomes legal to do whatever harm you can to those who protest this paid killing. But during the civil rights movement, southern police officers hid behind the guise that they were just upholding the laws of their state.
Even more ominous is the tragic similarity to CT Page 5028 Nazi Germany and Soviet Russia. In Nazi Germany, social killing started with abortion and followed to its logical conclusion — that if it is legal to kill unborn children, then it can be made legal for the state to permit the killing of anyone else they desire. Our country condemned this after World War II — and condemned the German people for not speaking out against what their leaders were doing. Yet we are now following in their footsteps. No, we are not exactly in their footsteps because we are abusing and condemning those who are protesting our actions — the very thing we said the German people should have done. In Russia, it has been well documented that civil dissent is met with physical abuse, torture, jailing under harsh and inhumane conditions. Sound familiar? But this is America — or at least it is supposed to be.
 This past weekend in West Hartford was a tragic episode in the annals of civil rights. Will it wake our country up — or will we continue to travel down the pay-for-killing road that we have followed for nearly two decades and that has now escalated into the type of torture, abuse and tyranny that is justified and approved by at least one judge. West Hartford may very well become a crossroads in our country. Let us pray that we take the right turn and head back to sanity and eliminate all paid-for killing in our society — and not take the other road which permits more and more killing for less and less reason. That second road also leads to the reduction of civil rights to any who protest that road — as was so graphically and tragically shown in West Hartford.
12. So written, John M. Spear's editorial contained many serious inaccuracies, including: that all of the protesters' activities in West Hartford on April 1, 1989 were peaceful and non-violent; that several protesters were beaten until they passed out from the pain; that some protesters were bound so tightly with CT Page 5029 plastic cables that their hands turned blue; that other protesters were dragged by their handcuffs after they were arrested; that some protesters' fingers were bent over backward until they touched their arms; that after the protesters were arrested, they were told by the West Hartford Police Chief that they had gotten what they deserved; that five arrested protesters suffered broken arms at the hands of the police, yet they and the other arrestees were denied all medical attention until thirty-two hours after they were taken into custody; that twenty-three arrested protesters were forced to spend the night in a cold courthouse lockup without bedding or blankets; and that at least one arrested protester with a dislocated arm had his arm twisted behind his back while standing before a judge in a crowded West Hartford courtroom, but the judge did nothing to stop the obvious abuse.
13. On June 17, 1989, at approximately 6:00 a.m., John M. Spear received an anonymous telephone call reporting that another "rescue" would be conducted that very day at the Summit Women's Center in West Hartford. Anxious to verify what he had been told by Catherine A. Jersey and William Waugh about the alleged brutality of the West Hartford Police, he promptly telephoned his brother, Howard Spear, who was then a co-owner of Spear Printing and a photographer for the Orange County Post, with the suggestion that he go at once to West Hartford to observe and document the day's events. Complying with this suggestion, Howard Spear promptly travelled to West Hartford, where, remaining outside of the Summit Women's Center, he took pictures of the police and the protesters. Howard Spear did not participate in the protest, and thus was not arrested for his activities on June 17, 1989.
The Response of the Town ofWest Hartford to the "Rescues"
14. As a result of the first two "rescues" at the Summit Women's Center, the Town of West Hartford incurred significant costs for police overtime services and was exposed to at least two claims for Worker's Compensation benefits by officers who had been injured responding thereto. Therefore, when Town officials were alerted by unnamed sources that a third "rescue" might be attempted at the Summit Women's Center on or about July 1, 1989, the Town authorized its Corporation Counsel to file a federal lawsuit both to enjoin those who planned and participated in the first two "rescues" from repeating their illegal conduct and to recover money damages from them for all expenses incurred by the Town to date. CT Page 5030
15. The task of drafting the Town's federal complaint was assigned to Assistant Corporation Counsel Patrick Alair, who consulted in the process with West Hartford Corporation Counsel Marjorie Wilder, West Hartford Police Chief Robert McCue, West Hartford Deputy Police Chief Craig Carozza, and several other members of the West Hartford Police Department. To aid himself in preparing the complaint, Attorney Alair obtained and reviewed all reports of West Hartford Police officers concerning their efforts to put down both protests, all records obtained by West Hartford Police officials from other law enforcement agencies as to the criminal records and past participation in abortion clinic "rescues" of the arrestees, and several civil complaints in other pending actions where similar relief had been sought against groups and individuals who had mounted or threatened to mount disruptive, illegal, anti-abortion protests at other clinics where abortions were performed.
16. As part of his preparations, Attorney Alair carefully considered all the information he had received about the Plaintiffs' employee, Catherine A. Jersey. To begin with, he took note of Ms. Jersey's illegal conduct during the first "rescue" her unwelcome entry into defendant Summit's facility, her refusal to cooperate with responding officers when told to leave, and her direct interference with the officers' efforts to remove other protesters from the facility. To him, such conduct clearly demonstrated that regardless of Ms. Jersey's press affiliation or responsibilities, she was an active member or supporter of Operation Rescue and an active participant in the "rescue."
This conclusion, moreover, was buttressed both by Ms. Jersey's record of criminal participation in similar protests elsewhere and by the timing of her arrival in West Hartford on the day of the "rescue." The West Hartford Police Department had compiled the criminal records of all persons who had been arrested in the two "rescues." In so doing, it had determined that Ms. Jersey had previously been arrested on at least two prior occasions or similar conduct. Ms. Jersey's pattern of illegal anti-abortion protest activity supported the logical inference that on April 1, 1989, her disruptive conduct was that of an active participant in the "rescue," not of a neutral press observer.
17. As for the timing of Ms. Jersey's arrival in West Hartford on April 1, 1989, she had obviously made it all the way to West Hartford from her home in New York State — a distance of over two hours by car — in time to enter the Summit Women's Center before
CT Page 5031 the West Hartford Police were notified of the "rescue" and responded to the scene. This, of course, meant that she had known of the "rescue" in advance, either because she had helped to plan it or because she had been given advance notice of it. In either event, such advance knowledge supported the inference that Ms. Jersey was either a member or an active supporter of Operation Rescue, for as Attorney Alair had learned in his pre-suit investigation, Operation Rescue operated in strictest secrecy, never divulging its plans to stage a "rescue" to anyone outside of its own inner circle of trusted supporters. Based on all of the foregoing information, Attorney Alair concluded that Ms. Jersey should be held partially responsible for the "rescues" at Summit.
18. Following up, moreover, on Ms. Jersey's self-identification as a member of "the press," Attorney Alair learned that she was indeed employed by a newspaper called the OrangeCounty Post, which was published by Spear Printing Company and edited by John M. Spear in Washingtonville, New York. That newspaper, he also learned, had published the false, defamatory account of the April 1, 1989 "rescue" described in paragraph 11 above, in which the West Hartford Police had been falsely accused of brutal misconduct in the handling of arrested protesters.
Based on those facts, Attorney Alair drew two principal conclusions: first, that John M. Spear and Spear Printing Company has conspired and combined together with the other named defendants to plan and mount the two protests; and second, that Spear and Spear Printing had written and published the false, defamatory account of the West Hartford Police response to the initial, April 1, 1989 "rescue" in order to extort a softened or less diligent response from the Town of West Hartford to future protest activities either at Summit or elsewhere in West Hartford.
Attorney Alair's first conclusion was based upon: Ms. Jersey's apparent attendance at and participation in the "rescue" at the behest of the plaintiffs; Ms. Jersey's advance knowledge of the "rescue," as evidenced by her early arrival at the Summit Women's Clinic before the West Hartford Police could respond thereto; the plaintiffs' advance knowledge of the "rescue," as evidenced by their advance notification of Ms. Jersey that it was about to occur; and the well-known policy of Operation Rescue to restrict information about coming "rescues" to its members and most trusted supporters only. The plaintiffs, he reasoned, could never have learned of the "rescue" in time to send their employee to it, and would never have supported the "rescue" by so doing, unless they CT Page 5032 were committed members or trusted supporters of Operation Rescue, who had conspired and combined with the other defendants to mount the "rescue."
Attorney Alair's second conclusion — that John M. Spear and Spear Publishing Company had written and published their false, defamatory account of the April 1, 1989 "rescue" in order to extort a more lenient response from West Hartford Police to further protests at Summit and elsewhere in West Hartford — was based upon information he had received from lawyers handling cases involving similar "rescues" elsewhere. Those lawyers had reported that a favorite tactic of Operation Rescue throughout the country was to threaten lawsuits for police brutality and publicize alleged acts of police mistreatment of protesters in order to elicit a softened police response to their protest efforts. Attorney Alair believed that the plaintiffs' account of the West Hartford Police Department's response to the April 1, 1989 "rescue" had obviously been written and published for that very purpose, for the assertions in it were as highly inflammatory as they were demonstrably false.
19. Having determined that there was probable cause to believe that Plaintiffs John M. Spear and Spear Printing Company had combined and conspired together with Operation Rescue and other groups, organizations and individuals to mount the April 1 and June 17, 1989 "rescues" at the Summit Women's Center, and having concluded, on that basis, that they were both liable for what had already occurred there and likely to mount similar protests in the future if they were not enjoined from so doing, Mr. Alair and West Hartford Corporation Counsel Marjorie Wilder named Spear and Spear Printing as defendants in the Town's federal complaint.
20. The Town of West Hartford filed its above-described federal complaint in the United States District Court for the District of Connecticut on or about June 29, 1989.
The Intervention
21. Shortly after the underlying lawsuit was filed, a hearing was scheduled on the Town's request for a preliminary injunction. In anticipation of that hearing, the Town's attorneys concluded that their position before the Court might be strengthened if other entities which shared their concerns — notably Summit, the target of the protests, and NOW, an experienced, nationwide advocacy group for the reproductive rights of women — joined with them in CT Page 5033 pressing their claims. To that end, Attorney Alair made telephone contact both with Summit, through its Executive Director, Marleisa Montgomery, and with NOW, through its in-state attorney, Anthory F. Slez, Jr.
22. In his conversation with Ms. Montgomery, Attorney Alair briefly described the pending lawsuit, advised her of the scheduling of the preliminary injunction hearing, and urged Summit to protect its own interests and those of its patients by joining in the Town's effort to enjoin further protest activities. Ms. Montgomery, who had witnessed both "rescues," was well aware of the damage and disruption they had caused, and thus of the benefits that could be gained by preventing their recurrence. She was also well aware that as a result of the protests, Summit's landlord was threatening to terminate its lease due to the fears of other tenants that if the protests continued, building security would be compromised and their business would be disrupted. Even so, she was concerned that Summit's participation in the lawsuit might prove costly or unwise, and so demurred to Attorney Alair's entreaty, telling him that she would first have to consult with Summit's attorneys.
23. In his initial conversation with Attorney Slez, Attorney Alair gave the same general description of the lawsuit he had given to Ms. Montgomery, plus a brief historical description of the two "rescues" which had prompted the Town to file it. He then asked for NOW's participation and support in the prosecution of the lawsuit, noting that he had made a similar request of defendant Summit. Attorney Slez responded that he would promptly raise the matter with NOW's Executive Director, then get back to Attorney Alair with her reply.
24. Attorney Slez immediately contacted NOW's Executive Director, Gail Brooks, who approved the intervention and authorized Attorney Slez to pursue it.
25. In the meantime, Ms. Montgomery contacted Summit's corporate lawyers at Gordon Hiller in Bridgeport, who assigned Attorney Amy Greenberg to respond to her inquiry. Ms. Montgomery first told Attorney Greenherg about the substance of her conversation with Attorney Alair, then informed her of what she and other Summit staff members had observed during the April 1 and June 17, 1989 "rescues" at the Summit Women's Center. Though Ms. Montgomery could recount from personal knowledge all of the illegal protest activities which had taken place inside the clinic during CT Page 5034 both "rescues," as they are described in paragraphs 7 and 9 above, she could not identify any particular individual who had planned, organized and/or otherwise participated in either "rescue."
Ms. Montgomery then explained to Attorney Greenberg that although Summit was eager to put a halt to the "rescues," she was worried that its participation in the Town's lawsuit might result in great and unnecessary expense and/or the filing of retaliatory lawsuits against Summit. Thus, though she asked Attorney Greenberg to advise her if Summit's participation in the lawsuit was possible and advisable, she gave her no authorization to proceed if that was indeed the case.
26. At the end of her conversation with Ms. Montgomery, Attorney Greenberg called Attorney Alair. In the conversation that followed, Attorney Alair first related his own general description of the two "rescues," then explained why the Town had decided to bring a lawsuit against those who had perpetrated them. He then explained how he and the West Hartford Police Department had attempted to identify those responsible for planning, organizing, and/or participating in the "rescues," noting generally the sources of investigative information on which he and other Town officials had relied in framing the Town's Verified Complaint. Finally, he explained generally how, in light of what he and the others had learned in the course of their investigation, the Town had decided whom to name as defendants in its lawsuit, and on which legal theories they should be sued.
27. Though Attorney Greenberg was an experienced litigator, she had little prior experience in federal court and no familiarity at all with federal civil RICO actions. Thus, though she was impressed both by the professionalism of Attorney Alair and by the apparent care and completeness of his investigative efforts, she found herself unable to assess the validity of the Town's legal theories, and in need of further guidance as to how Summit should proceed if it wished to join in the lawsuit. Therefore, at the end of her conversation with Attorney Alair, she promptly telephoned Attorney Slez, an experienced federal litigator whom she knew to be considering a similar request from the Town on behalf of NOW.
28. In her conversation with Attorney Slez, Attorney Greenberg was told that the best way to join in a pending federal lawsuit was to file a motion to intervene under Rule 24 of the Federal Rules of Civil Procedure, accompanied by an intervening complaint which simply adopted all the allegations of the plaintiff's pending CT Page 5035 complaint. By so doing, explained Attorney Slez, a would-be intervenor would not only save time in preparing his motion to intervene, but would disenable any party opposing intervention from claiming that the intervention would add confusing new issues to the case or unduly delay its adjudication.
Attorney Slez further explained, however, that before a would-be intervenor could properly adopt a pending complaint, it must satisfy itself that there is a valid factual and legal basis for each of the claims and allegations set forth therein. In this case, he specifically noted, he would shortly do just that by questioning Attorney Alair as to the factual and legal basis for each of the claims and allegations in the Town's Verified Complaint. Once he had done so, he assured Attorney Greenberg, he would call her back to tell her what he had learned.
29. Attorney Slez then had a lengthy telephone conversation with Attorney Alair as to the factual and legal basis for the Town's Verified Complaint. Having no fax machine in his office, he had Attorney Alair read to him over the telephone each and every paragraph of the Verified Complaint, then describe for him in detail all of the factual information and materials on which the Town had based each claim and allegation set forth therein.
On the basis of that conversation, and of his own detailed knowledge of the standard practices and tactics of Operation Rescue and its supporters, as gleaned from the published writings of anti-abortion activists like Joseph Scheidler and Randall Terry, Attorney Slez came to the following conclusions: first, that the two "rescues" at the Summit Women's Center, as observed and described by Attorney Alair, Ms. Montgomery and her staff, and the West Hartford Police, had been organized and conducted by members of Operation Rescue, for the tactics used on both occasions were identical to those routinely used by Operation Rescue in similar protests throughout the United States; second, that the results of Attorney Alair's police-aided investigation were accurate and reliable; and third, that the resulting factual and legal conclusions of, Attorney Alair, West Hartford Corporation Counsel Marjorie Wilder, and West Hartford Police Chief Robert McCue as to who had planned and mounted both "rescues" were accurate and reliable as well. In short, Attorney Slez agreed with Attorney Alair, Attorney Wilder and Chief McCue that there was probable cause to believe that each of the named defendants had conspired and combined together to mount the two "rescues," in violation of RICO and the other state and federal statutes listed in the Town's CT Page 5036 Verified Complaint.
30. As for John M. Spear and Spear Printing Company in particular, Attorney Slez agreed with the Town's conclusion that they had joined in the conspiracy to mount the "rescues," based upon: the repeated criminal involvement of their employee, Catherine Jersey, in both "rescues;" Ms. Jersey's prior criminal involvement in other "rescues" elsewhere and apparent advance notification of the "rescues" at Summit; Ms. Jersey's self-identification as a member of the press when she was arrested at the first "rescue";" Mr. Spear's writing and Spear Printing's publication of a demonstrably false account of the first "rescue" in a newspaper which neither covered nor circulated generally in the town where the "rescue" occurred; and the Orange County Post's apparent advance notification of the "rescues," as evidenced by the early morning appearances of its employees, Ms. Jersey and Howard Spear, at one or both of them. From his reading of Operation Rescue literature and prior discussions with other lawyers representing women's health clinics against anti-abortion protesters, Attorney Slez was well aware that "rescues" were planned and organized in secret, with no advance notice of their impending occurrence to anyone but those who supported or planned to participate in them. In his view, then, a reasonable conclusion to be drawn from the early arrival of Catherine Jersey, a self-identified Spear employee, at both "rescues," was that she had been sent there by her employers, the plaintiffs, who must therefore have had advance, insider notice of the "rescues."
Attorney Slez was also familiar with the published recommendation of national anti-abortion leaders to engage in conduct designed to force or induce local police to soften their response to activists' "rescue" efforts. With that knowledge in mind, he thought it reasonable for the Town's lawyers to conclude that the publication of a false, defamatory account of police brutality at the April 1, 1983 "rescue" was a deliberate attempt to extort a softened response from West Hartford Police to future "rescues," in violation of RICO and the Hobbs Act.
31. Following his discussion of the Town's Verified Complaint with Attorney Alair, Attorney Slez recontacted Attorney Greenberg to tell her what he had learned. After apprising her generally how he had questioned Attorney Alair about the factual and legal basis for the Town's claims and allegations, he pronounced himself satisfied that each such claim and allegation was supported by probable cause, and urged Summit, on that basis, to join NOW in CT Page 5037 filing an intervening complaint which adopted the Town's Verified Complaint. NOW, he explained, was prepared to file its motion to intervene accompanied by an affidavit representing to the Court that if intervention were permitted, it would promptly file such a "mirror complaint." Summit, he offered, could join in NOW's motion if it wished to.
32. Attorney Greenberg then communicated Attorney Slez's conclusion and advice to Marleisa Montgomery, who agreed, on that basis, that Summit should join in NOW's motion to intervene under the joint representation of Attorney Greenberg and Attorney Slez. Upon notifying Attorney Slez of Summit's decision, he prepared and filed a motion to intervene, a supporting affidavit, and a personal appearance on behalf of NOW and Summit. This motion was argued before Judge Peter C. Dorsey on July 24, 1989. On August 24, 1989, Judge Dorsey granted the motion to intervene as to Summit but denied it as to NOW for the reasons stated more fully on pages 3-4 of this Memorandum of Decision.
33. Thereafter, on September 22, 1989, Summit, through its new counsel, Attorney Pamela Hershinson, filed an intervening complaint which, with only minor technical changes, duly mirrored the Town's Verified Complaint. In so doing, Attorney Hershinson believed that if Summit truly wished to intervene in the Town's action, it was bound by Judge Dorsey's Ruling to file a mirror complaint. She also believed, however, that Summit was well justified in so intervening, for between the time she took over Summit's representation and the time she filed the intervening complaint, she not only received and closely examined all of the pleadings that had been filed to that time, but had detailed conversations with Marleisa Montgomery, Attorney Greenberg and Attorney Alair which persuaded her that there was probable cause to support each of the claims and allegations of the Town's Verified Complaint.
Ms. Montgomery informed Attorney Hershinson of all that she and other Summit staff members had witnessed in the course of the two "rescues." Attorney Greenberg informed her of the process by which the intervention had been pursued. Attorney Alair, most importantly, explained to her the process by which Town officials had investigated the "rescues" and described for her, as he had previously done for Attorney Slez, the complete factual and legal basis upon which the Town had concluded that each of the named defendants had conspired and combined together to mount the "rescues," in violation of RICO and the other federal and state statutes listed in the Verified Complaint. Among other things CT Page 5038 discussed in her conversation with Attorney Alair was the apparent role of John M. Spear and Spear Printing Company in mounting the "rescues," as supported by the facts described more fully in paragraphs 16-18 and 25 of this Memorandum of Decision.
After having these conversations with Ms. Montgomery, Attorney Greenberg and Attorney Alair, Attorney Hershinson advised Summit, through Ms. Montgomery, to file a mirror complaint. Summit, whose staff knew well what had happened at the Summit Women' Center but had no personal knowledge of who was responsible for it, relied upon the advice of Attorney Hershinson and the information of those with whom she had spoken in giving her authority to file the intervening complaint.
Prosecution of the UnderlyingAction After the Intervention
34. The case remained pending against John M. Spear and Spear Printing Company, Inc. until December 6, 1989, when they were dropped therefrom as defendants by the Town's and Summit's joint filing of their Second Amended Complaint. No substantive activity of any kind took place between the filing of the intervening complaint and the filing of the Second Amended Complaint.
Adverse Effects of the Underlying ActionUpon John M. Spear and Spear Printing
35. When John M. Spear learned that he and Spear Printing Company, Inc., had been sued under RICO, he was both angry and upset that he had been sued for expressing an opinion in an editorial, and worried that the court might shut down the business, which had been in his family since the 1940's. He claims as well that he was personally humiliated by being named a defendant in a RICO action, and that he suffered embarrassment when his acquaintances in Washingtonville asked him about the charges after reading about them in the press.
36. The Court finds, however, that Mr. Spear's upsettedness at being named a defendant in the underlying action was not at all affected by Summit's intervention in the action, for all of the publicity about the case was generated before the attempted intervention. In fact, Mr. Spear could not even say whether any of the questions asked of him by his friends and neighbors either concerned the intervention or came after it. CT Page 5039
37. Mr. Spear and Spear Printing were represented in the underlying action by Attorney Vincent B. McCarthy, who appeared without fee. Even so, Mr. Spear has always felt a "moral obligation" to pay Mr. McCarthy for the time he spent representing him in that action.
The Plaintiffs' Subsequent Effortsto Recover Damages as a Result ofthe Underlying Action
38. After Mr. Spear and Spear Printing were dropped from the underlying action, they filed a federal civil rights action against the Town of West Hartford, its Corporation Counsel, Marjorie S. Wilder, its Chief of Police and Acting Town Manager, Robert R. McCue, and defendant Summit's corporate predecessor, Summit Women's Center West, Inc., seeking to recover damages for all losses they claim to have suffered and all costs they claim to have incurred as a result of the underlying action. That action, entitled JohnM. Spear and Spear Printing Company, Inc. v. Town of West Hartford,et als., Civ. No. H-90-682 (AHN), was dismissed as to Summit for failure to state a valid federal claim. Following the dismissal, Judge Nevas issued a Supplemental Judgment, in which he ordered Spear and Spear Printing to reimburse Summit in the amount $13,463 for all attorney's fees it had incurred in defending itself against the action.
39. The instant action was commenced after the dismissal of the plaintiffs' federal civil rights action. The plaintiffs' true and overriding purpose bringing this action was to obtain a judicial declaration that they did nothing wrong by writing and publishing the editorial entitled "Northern Red Necks," and to recover damages for all losses they claim to have suffered as a result of the defendant's participation in the maintenance and prosecution of the underlying action. The plaintiffs' purpose for bringing this action was not to prevent or delay the defendant from collecting its supplemental judgment for attorney's fees in the plaintiffs' federal civil rights action.
CONCLUSIONS OF LAW
Vexatious Suit
 Elements
"A vexatious suit is a kind of malicious prosecution action, CT Page 5040 differing principally in that it is based upon a prior civil action, whereas a malicious prosecution suit ordinarily implies a prior criminal complaint." Vandersluis v. Weil, 176 Conn. 353, 356
(1978). To establish a cause of action for vexatious suit, a plaintiff must prove by a fair preponderance of the evidence that the defendant maintained and/or prosecuted a prior civil action against him, that said prior civil action terminated in his favor, and that the defendant's unsuccessful maintenance and/or prosecution of the prior action was with malice and without probable cause. Id.
 Initiation of Prior Civil Action By the Defendant
Under our law of vexatious suit, a person maintains and/or prosecutes a civil action when he either initiates the action personally; Zenik v. O'Brien, 137 Conn. 592, 596 (1951); or contributes materially to its prosecution after it is brought.Fusario v. Cavallaro, 108 Conn. 40, 43 (1928).
As explained by the Connecticut Supreme Court in the context of a malicious prosecution action, "A person is deemed to have initiated a proceeding if his direction or request, or pressure of any kind by him, was the determining factor in the officer's decision to commence the prosecution." Zenik v. O'Brien, supra. Under this definition, potential liability for vexatious suit extends both to each named plaintiff in a challenged civil action, and to each other person who played a material role in the bringing of the action.
Even, however, if a defendant played no role at all in the bringing of the challenged civil action, he can still held liable for vexatious suit in connection with that action if it is shown that he "voluntarily conspire[d] and maliciously join[ed] in the prosecution without probable cause" after the action was brought.Fusario v. Cavallaro, supra. It has thus been said that, "All who knowingly procure, direct, aid, abet or assist in, or subsequentlyadopt [the claims made in the original action] are liable as joint tortfeasors for the damage done [there] by. . . ." McGann v. Allen,105 Conn. 177, 185 (1926) (Emphasis added).
In this case, the plaintiffs have pleaded and proved by a fair preponderance of the evidence that from September 22 through December 6, 1989, defendant Summit participated as an intervening plaintiff in the Town of West Hartford's federal civil RICO action entitled Town of West Hartford v. Operation Rescue. et als., Civ. CT Page 5041 No. H-89-400 (PCD). Under the foregoing authorities, such proof clearly establishes the "maintenance or prosecution" element of the tort of vexatious suit, for it demonstrates that in the time frame specified in the complaint, Summit knowingly "adopted" the claims and allegations of the Town's Verified Complaint and contributed materially to the prosecution of the underlying action. McGann v.Allen, supra.
 Termination of the Prior Action in Favor of the Plaintiffs
A prior action is deemed to have terminated in favor of the plaintiff in a vexatious suit action if it is shown either to have been adjudicated in his favor, by a verdict at trial or by a decision on a dispositive motion, or to have been abandoned by his opponent, "without request from or by arrangement with him." Seev. Gosselin, 133 Conn. 158, 160 (1946) (holding that the unconditional, unbargained-for nolle of a criminal prosecution constituted the termination of the underlying prosecution in favor of the plaintiff). By this logic, the unconditional withdrawal of a civil action, without compromise, consent or consideration, constitutes the termination of that action in favor of the defendant. Colli v. Kamins, 39 Conn. Sup. 75, 77 (Super.Ct. 1977) (holding that the unconditional withdrawal of a civil action is analogous to the entering of an unconditional nolle in a criminal prosecution). Cf. Blake v. Levy, 191 Conn. 257, 264 (1983) (holding that, "[w]hen a lawsuit ends in a negotiated settlement or compromise, it does not terminate in the plaintiff's favor and therefore will not support a subsequent suit for vexatious litigation.")
In this case, it is undisputed that defendant Summit voluntarily and unconditionally withdrew all of its claims against plaintiffs John M. Spear and Spear Printing Company when, on December 6, 1989, it joined with the Town of West Hartford in filing the Second Amended Complaint. With the filing of the Second Amended Complaint, and the concomitant discontinuation of all proceedings against them, the underlying action terminated in favor of Spear and Spear Printing as a matter of law.
 Prosecution of the Prior Action with Malice and Without Probable Cause
The final two elements of the tort of vexatious suit — malice and absence of probable cause — concern the mental state with which CT Page 5042 the defendant acted when it maintained and/or prosecuted the underlying action. Though these elements, at times, are interrelated, each must be independently established to support a claim for vexatious suit.
"Malice, in reference to th[e] subject [of vexatious civil litigation], is any improper motive. It need not imply malignity, nor even corruption, in the appropriate sense of those terms." Ivesv. Bartholomew, 9 Conn. 309, 313 (1832). It has thus been held that a civil plaintiff acts with malice whenever his "main object" in pursuing a lawsuit is "to vex, harass [or] injure" his opponent.Id.; Thompson v. Beacon Valley Rubber Co., 56 Conn. 493, 497
(1888) (holding, inter alia: that to establish malice, the plaintiff must prove that the defendant's improper purpose was "the main object" of his challenged lawsuit; and thus that proof of an improper purpose which was "only incidental [to the lawsuit]. . . cannot be regarded as evidence of malice[.]")
Malice may be express or implied. Zitkov v. Zaleski,102 Conn. 439, 446-47 (1925). Express or actual malice is established by proof that the defendant's chief motivation for maintaining or prosecuting the underlying lawsuit was a particular improper motive or purpose, such as feelings of hatred, ill will or hostility towards the plaintiff; id., 446; or a desire to subject the plaintiff to embarrassment, humiliation or expense. Hammond v. Rowley,86 Conn. 6, 8 (1912); Bridgeport Hydraulic Co. v. Pearson,139 Conn. 186, 194-195 (1952). Implied malice, by contrast, is an inference of improper motive or purpose which the factfinder may, but is not required to draw from proof that the defendant brought or pursued the underlying action without probable cause. Ives v. Bartholomew, supra.
For the purpose of determining liability for vexatious suit, probable cause is defined as "knowledge of facts sufficient to justify a reasonable person in the belief that there are reasonable grounds for prosecuting an action." Vandersluis v. Weil, supra,176 Conn. at 356. To establish that a vexatious suit defendant pursued his underlying action without probable cause, the vexatious suit plaintiff must therefore prove that at the time of the underlying action, the defendant lacked sufficient information to persuade a reasonable person as to the probable validity of his claims.
The determination whether or not a defendant had probable cause to pursue a particular claim or cause of action, though by definition objective, is of necessity highly personalized. Plainly, CT Page 5043 it depends on the particular state of the defendant's knowledge and belief at the time he brought or joined in the underlying action. Whether or not the defendant was correct in his belief that the plaintiff had engaged in actionable conduct is not the proper test for determining if he acted with probable cause when he pursued the underlying action. What matters instead is the kind and quality of information on which he personally relied when he subjected the plaintiff to that action. McGann v. Allen, supra,105 Conn. at 186. The sufficiency of a defendant's information to justify pursuing a particular claim depends not only of what he then knew or believed, but on how he had come to know or believe it. The objective reasonableness of a person's belief in the probable existence of particular facts — here, the essential elements of a valid cause of action — depends upon the totality of the circumstances in which his basis for that belief is developed. SeeIllinois v. Gates, 462 U.S. 213 (1983) (distinguishing determinations of probable cause based upon a person's own information received from other known and unknown sources of greater or lesser proven reliability); State v. Barton, 219 Conn. 529
(1991).
There is certainly no requirement that a party filing a lawsuit gather all of his information personally, either by the operation of his own senses or by the conduct of his own investigation. To the contrary, it is well established that hearsay information can support a finding of probable cause as long as there is a substantial basis for crediting it. However, the reliability of a person's information plays a pivotal role in assessing its sufficiency to support a finding of probable cause, and that, in turn, depends critically on the identity and credibility of its source. Different individuals who decide to pursue a single lawsuit based on different sets of information, or even on similar information coming from different sources, are therefore subject to separate, possibly conflicting, determinations of probable cause due to the differing reliability of the data on which they rely. See, e.g., Vandersluis v. Weil, supra, 176 Conn. at 361.
Over the years of vexatious suit litigation in Connecticut, the relationship between malice and lack of probable cause has been well defined. Logically, proof of the latter has been found to support an inference of the former, on the theory that anyone who would bring or join in a lawsuit without what a reasonably prudent person would regard as sufficient factual basis for so doing can fairly be thought to have appreciated the injustice of his conduct, and thus to have acted with an "improper motive." Ives v. Bartholomew, CT Page 5044 supra, 9 Conn. at 312 ("If a person commences an action, . . .,knowing that he has no cause of action, . . . he intends to vex, harass and injure hi[s opponent]; and this is malicious enough.").
Such an inference, however, is not by any means a necessary one, for in fact there are many situations in which persons who personally lack sufficient factual information to support a finding of probable cause to prosecute a claim or cause of action cannot reasonably be found to have acted with ill will, an intent to vex, harass or annoy the plaintiff, or any other improper motive. Chief among these are those situations where persons harmed by the conduct of unknown persons bring suits against strangers based on the investigative efforts and legal advice of their attorneys. When such a person brings or joins in a lawsuit in complete good faith, without an improper motive, his personal lack of sufficient factual information to support a finding of probable cause will not make him liable for vexatious suit.
Proof of malice, on the other hand, does not in any way tend to establish lack of probable cause. Because the latter determination is purely objective — depending, as it does, solely on the facts which are known to the defendant when he acts — it is uninfluenced by the defendant's accompanying motives, good or evil. Thus, just as lack of an evil motive does not add to probable cause, the presence of such a motive does not undermine it if the known facts and circumstances are sufficient to justify the bringing of the action. McGann v. Allen, supra, 105 Conn. at 187.
The gravamen of this defendant's claim against plaintiffs John M. Spear and Spear Printing Company in its underlying federal lawsuit was that they had joined with the other named defendants in a conspiracy to mount the two "rescues" at the defendant's West Hartford clinic in the Spring in 1989. The alleged conspiracy, the defendant further pleaded, had been entered into and carried out in violation of the Hobbs Act, for one of its objectives, to which the plaintiffs allegedly subscribed and devoted their efforts, was to extort a softened or less diligent response by local police officials to the rescuers' future protest activities by writing and publishing false accounts of alleged police violence in putting down the initial rescues.
On the record developed at trial, it is apparent to this Court that the defendant, through its officers and employees, never had a sufficient factual basis for believing that these plaintiffs had joined in a RICO conspiracy as alleged, much less to further the CT Page 5045 objective of that conspiracy, in violation of the Hobbs Act, by writing and publishing false accounts of police violence at the initial protest. Summit officials and staff were of course well aware of what had happened inside their clinic during the two rescues. They had witnessed the rescuers' physical invasion of their clinic first hand. They had taken the obscene and threatening phone calls that disrupted their switchboard, observed and confronted the protesters who trespassed in their offices, and watched the police struggle to remove the protesters when they refused to leave. They had also witnessed the damaging of their fixtures and equipment and experienced the frustration of discontinuing medical services for their clients while repairs were being made.
What Summit officials and staff could not do, however, was to identify the persons responsible for perpetrating the harms they and their patients had suffered, because the rescues took place in an atmosphere of great commotion and most of those who were arrested refused to give their names to the police.
In the aftermath of the two rescues, Summit officials and staff cooperated fully with the West Hartford Police Department in conducting its investigation and in prosecuting those arrested. In light of the above-described limits on their information as to who had staged or participated in the rescues, however, their assistance was necessarily limited to describing what they had observed and experienced when the rescues took place. Moreover, having confidence in the police, they initiated no private investigation themselves, and focused their energies instead on repairing the damage to their clinic and offices so that full clinic operations could be resumed. Throughout this process, they never heard of John M. Spear or the Spear Printing Company.
When West Hartford Assistant Corporation Counsel Patrick Alair telephoned Ms. Montgomery to suggest that Summit join the Town in prosecuting the underlying action, and in particular to intervene in that action in time to participate in the upcoming hearing on the Towns' request for injunctive relief to halt threatened future protests, Ms. Montgomery responded with great caution and circumspection. Though she surely wished, on behalf of the defendant, to put an end to the ongoing protest campaign, she immediately voiced concerns about the costs of pursuing such relief, both immediate and long term. On the latter subject in particular, Ms. Montgomery's instincts prophetically told her that involvement in such a lawsuit, however justified and appropriate, might engender CT Page 5046 retaliatory litigation in the future. She therefore turned the entire question of intervention over to Summit's corporate lawyers at Gordon Hiller in Bridgeport.
Gordon Hiller, as previously noted, turned Summit's inquiry over to Attorney Amy Greenberg, who after discussing the ongoing protests with Ms. Montgomery, consulted at length with Attorney Alair as to the Town's pending action. In her conversation with Mr. Alair, Ms. Greenberg developed a substantial factual basis for believing that each defendant named in that action, including plaintiffs John M. Spear and Spear Printing Company, had joined in the alleged conspiracy to mount the protests at Summit. Even so, she found herself uncertain as to how, if at all, Summit should proceed in light or what she had been told, and so she discussed the entire matter with NOW's experienced local counsel, Attorney Anthony F. Slez, Jr.
Attorney Slez, after conducting an exhaustive review of the allegations of the Town's Complaint and of the factual bases therefor with West Hartford Assistant Corporation Counsel Patrick Alair, had a lengthy conversation with Attorney Greenberg as to what he had learned and concluded. First, he confirmed Attorney Greenberg's own conclusion that the Town had conducted a thorough, responsible investigation of the rescues and their perpetrators. Second, on the basis of that investigation and of his own detailed knowledge of the tactics and operational procedures of Operation Rescue, which he shared with Attorney Greenberg, he offered the firm conclusion that there was probable cause to pursue the Town's action against each of the named defendants, including John M. Spear and Spear Printing Company.
As for Spear and Spear Printing, Attorney Slez based his conclusion, more particularly, on the following facts: Operation Rescue conducts its operations in strictest secrecy, not giving advance notice of its operations to anyone except its most trusted members and supporters; Spear Printing appeared to have received advance notice of the initial, April 1, 1989 rescue, due to the early arrival at and criminal involvement in the rescue of Spear if it wished to.
Based on the above-described input from Attorneys Alair and Slez, Attorney Greenberg appropriately agreed with Attorney Slez that there was in fact probable cause to believe that John M. Spear and Spear Printing Company were members of a conspiracy to mount the protests, as alleged by the Town, and concluded that Summit's CT Page 5047 interests would be well served by joining NOW's motion to intervene on the basis of the Town's well supported allegations.
When Attorney Greenberg called Ms. Montgomery back to advise her that Summit had good reason to intervene in the Town's lawsuit against the named defendants. Ms. Montgomery did not quiz her about the factual details she had discussed with Attorneys Slez and Alair. Instead, she listened to Attorney Greenberg's bottom-line assessment of the entire situation: that Summit would be well justified in joining in the Town's action, because the Town had carefully researched and well presented a factually sound and legally proper case; that Summit had a great deal to gain by the issuance of an injunction against threatened future protests; that the most appropriate way to join in the Town's action seeking such an injunction would be to join with NOW in the filing of a motion to intervene that proposed to adopt the Town's pending complaint in its entirety; and that if Summit decided to pursue the intervention, it should be jointly represented by herself, for Gordon Hiller, and by Attorney Slez. Ms. Montgomery, on behalf of Summit, listened closely to her lawyer's advice and followed it, authorizing Attorneys Slez and Greenberg to prepare and file the motion to intervene.
Had Attorney Greenberg shared with Ms. Montgomery the full factual details of her consultations with Attorneys Alair and Slez, apprising her of all the specific information the Town had learned in the course of its investigation, of Attorney Slez's detailed description of Operation Rescue's tactics and operational procedures, and of all the inferences of improper behavior she and the other attorneys had drawn therefrom, Summit would have had probable cause to believe that these plaintiffs were indeed members of the RICO conspiracy, as charged in the Town's complaint. The sources of information on which she and the other attorneys relied for their respective findings of probable cause were extremely reliable: the West Hartford Police Department, West Hartford's Assistant Corporation Counsel, the records of other police departments, and Attorney Slez's personal knowledge. Hence, though all such information was clearly hearsay, there was a substantial basis for crediting it. By not sharing that information, however, Attorney Greenberg never gave Ms. Montgomery any more than a generally phrased conclusion as to the propriety of pursuing the intervention. Despite her description of the careful process by which she had investigated the legal and factual bases of the Town's Complaint and come to the conclusion that the intervention was well-justified, she failed to share or describe the kind of supporting CT Page 5048 factual detail that would enable a reasonably prudent person to conclude that he had a sound cause of action. Thus the defendant, through Ms. Montgomery, lacked probable cause to proceed as it did before pursuing the intervention.
Having successfully sought permission to intervene in the Town's action, Summit had a second chance to acquire a sufficient factual basis upon which to justify the filing of a mirror complaint that adopted all the allegations of the Town's Complaint. That was when it took on new counsel, Attorney Pamela Hershinson, after permission to intervene was granted to Summit but denied to NOW. Prior to filing that Intervening Complaint, however, Attorney Hershinson had no substantive discussions with Summit officials as to the factual underpinnings of the Town's claims against individual defendants, including the instant plaintiffs, John M. Spear and Spear Printing Company. To the contrary, no such discussion then appeared necessary to Attorney Hershinson, for as she testified at trial, she felt herself duty-bound by Judge Dorsey's order granting the motion to intervene to file a "mirror complaint." It would not be until after Summit filed its Intervening Complaint that the matter of the plaintiffs' inclusion in the lawsuit would be revisited, and then only on the issue of whether it would be tactically wise to keep them as defendants in view of their status as an editor and a publisher.
In short, defendant Summit intervened in the Town's underlying lawsuit based on the advice of counsel who, though they personally knew of sufficient facts to justify the defendant's action against these plaintiffs, never shared those facts with the defendant's officers or agents in such a way as to give the defendant probable cause to pursue its underlying claims. Without personal knowledge of sufficient facts or circumstances to justify a reasonably prudent person in the belief that he had a valid cause of action, the defendant lacked probable cause to prosecute its underlying claims.
Notwithstanding Summit's lack of sufficient factual information to justify a reasonably prudent person in the belief that plaintiffs John M. Spear and Spear Printing Company had joined in a RICO conspiracy to mount the subject protests, as alleged by the Town, it is equally clear on this record that Summit did not act with any improper motive when it Joined in the Town's action against them. The defendant had suffered the wholesale disruption of its health care business, which involved the performance of legal abortions and the provision of family planning services to its clients. Its offices and clinic had been physically invaded on two occasions and CT Page 5049 was threatened with a third invasion in the near future, its fixtures and equipment had been damaged, and the entire clinic had been shut down on two occasions — once for a half day, once for a week — to permit the making of necessary repairs and the procurement of new equipment.
Despite this enormous disruption, however, Summit did not seek vengeance against, or even restitution from, those who had organized or participated in the rescues. Instead, it rededicated itself to its principal mission — of serving the health care needs and protecting the reproductive rights of its clients — and avoided all responsive gestures, grand or small, that might invite renewed invasions. To be sure, Summit officials cooperated fully with the Investigative efforts of Town officials. However, they took no independent steps to investigate the rescues or the rescuers for any private purpose, financial or otherwise.
When presented with the Town's proposal to join in its lawsuit and in particular its request for injunctive relief, Summit thus demurred, referring the matter to legal counsel for a careful review, evaluation and advice. Despite the urgency of the Town's request and the immediacy of its own need to halt further rescues, it wisely took its time to consider the matter and weigh its options.
When Summit ultimately decided to involve itself in the Town's action, it did so only after receiving the careful advice of its lawyers, particularly Attorney Greenberg, who had spent a great deal of time considering the factual and legal bases for the Town's action and the propriety of intervening in that action in light of Ms. Montgomery's expressed concerns. Though the lawyers did not pause, as previously noted, to share the all the minute factual details of their relevant conversations with other counsel with Ms. Montgomery, they surely gave her to believe and understand that the course they recommended was prudent and well justified.
Nothing in Ms. Montgomery's pursuit of legal advice, or in Summit's ultimate decision to follow that advice, was marked by hatred, spitefulness or ill will. She, after all, didn't seek out the opportunity to sue the plaintiffs and others; it was the Town that first approached her. She, moreover, did nothing to rush to a predetermined judgment to intervene, regardless of the circumstances. Instead, she took her time, despite the looming deadline before Judge Dorsey, and refused to jump on the Town's legal bandwagon just because the primary remedy sought — an CT Page 5050 injunction — was so obviously desirable.
Finally, when Ms. Montgomery took her lawyers' sound advice and decided to pursue the intervention, she did so based upon their resolute assurances in the face of her own doubts and concerns that the action was well founded. Surely she believed, and justifiably so, that intervention in the Town's action would be a perfectly lawful, proper way of asserting the defendant's legal rights, and nothing more.
This, then, is a case in which the defendant joined in an underlying action without probable cause, but also without malice. On the facts here presented, no implication of improper motive arises from the defendant's lack of probable cause since it honestly, appropriately, and for no selfish, ulterior reason pursued the underlying action based on the careful, considered advice of competent counsel.
Defense of Good-Faith Reliance Upon Advice of Counsel
In the foregoing discussion of malice, the Court has observed at length why on the facts here of record, the manner in which this defendant, through its executive director, sought and relied upon the advice of legal counsel defeats any claim that it acted with an improper motive when it joined in the Town's underlying action against John M. Spear and Spear Printing Company. Under our law, however, it is well established that even if malice is proved, a defendant in a vexatious suit action has a complete defense to that action if he can prove that he instituted his civil action "relying in good faith on . . . [the] advice [of legal counsel], given after a full and fair statement of all facts within his knowledge, or which he was changed with knowing. The fact that the attorneys advice was unsound or erroneous will not affect the result. Brodrib v.Doberstein, 107 Conn. 294, 296, 140 A. 483 [1928]; Smith v. King,62 Conn. 515, 26 A. 1059 [1893]. Vandersluis v. Weil, supra,176 Conn. at 361. This defense, as this Court previously noted, "is designed to protect the interests of common citizens who, unschooled in the law, would otherwise be forced to put themselves at great financial risk every time they resorted to the courts to assert their rights." Spear v. Summit MedicalCenter, Superior Court, judicial district of Hartford-New Britain at Hartford, Docket No. CV-92-0525939 (June 17, 1996, Sheldon, J.). CT Page 5051
 "Consistent with this purpose, the defense has five essential elements. First, the defendant must actually have consulted with legal counsel about his decision to . . . institute a civil action. . . .
 Second, the consultation with legal counsel must be based on a full and fair disclosure by the defendant of all facts he knew or was charged with knowing concerning the basis for his contemplated . . . action. No defendant can justifiably rely upon advice that he knows or should know to be untrustworthy due to his own failure to disclose relevant information to the person giving the advice.
 Third, the lawyer to whom the defendant turns for advice must be one from whom the defendant can reasonably expect to receive an accurate, impartial opinion as to the viability of his claim. Thus, although all lawyers are officers of the court, who are bound by their oaths "not wittingly or willingly [to] promote, sue or cause to be sued, any false or unlawful suit, or give and, or consent to the same," General Statutes § 1-25, the law recognizes that they too are people whose judgment may sometimes be clouded by their personal allegiances, sympathies and prejudices, where, then, a defendant claims reliance upon the advice of counsel for his decision to file a complaint or action, he must show that his counsel was one who may fairly be presumed to be "unbiased and unprejudiced against the party [complained of]." Brodrib v. Doberstein, supra, 297. . . .
 The fourth element of the defense of reliance upon the advice of counsel is, of course, that the defendant, having sought such advice, actually did rely upon it. If he did not, then he has no defense even if counsel was consulted.
CT Page 5052
 Fifth and finally, if all other elements of the defense are satisfactorily established, the defendant must show that his reliance on counsel's advice was made in good faith. . . . As used in the defense of reliance upon the advice of counsel, good faith is . . . the subjectively honest belief that one's civil action is fully justified both in law and in fact.
Spear v. Summit Medical Center, supra at 12-15.
In this case, the defendant has clearly proved each essential element of the defense of good-faith reliance upon the advice of legal counsel. First, as previously determined, it did in fact consult with counsel on the propriety of joining in the Town's lawsuit.
Second, the defendant made a full and fair disclosure of all facts it knew or was charged with knowing about the perpetrators of the rescues, having fully cooperated with the West Hartford Police Department in the aftermath of each rescue, fully shared all details concerning the rescues and their aftermath with Attorney Greenberg, when she first discussed the proposed intervention with Ms. Montgomery, and Attorney Hershinson before the Intervening Complaint was filed. The fact that Ms. Montgomery and her staff lacked sufficient personal knowledge of investigative facts developed by the West Hartford Police Department to personally have probable cause to sue Spear and Spear Printing does not in any way suggest that they should have known more. This is not a case in which civil plaintiffs wilfully blinded themselves to available, potentially exculpatory information that might have led them not to prosecute the underlying action. Instead, it is a case in which a victim of violent disruption by unknown individuals placed justifiable reliance on the advice of counsel and the investigative information of others whose work they had every right to respect and rely on — West Hartford Police officers and Town officials — after having fully apprised their lawyers of every relevant fact they knew about the rescues. In short, this defendant shared fully with its lawyers everything it knew as to the nature and perpetrators of the rescues.
Third, the lawyers to whom Summit turned for legal advice were thorough, professionally competent counsel who took the CT Page 5053 defendant's concerns seriously, investigated them carefully and at length, and refused to rush to judgment as to what was to be done. Attorney Greenberg, of Gordon Hiller, was one of Summits corporate lawyers. The work of her firm on Summit's behalf had involved a number of garden-variety civil matters, none of which was shown to have affected her presumptive objectivity in giving Summit an honest assessment of the bona fides of the Town's allegations. It was Attorney Greenberg, with substantial factual and legal input from Attorneys Alair and Slez, who gave Summit the final advice to intervene in the Town's lawsuit and to file a mirror complaint adopting all of the Town's allegations and claims.
Attorney Alair, to be sure, was counsel for the Town of West Hartford, which had already filed its action and was pursuing Summit's support. However, though he was surely an advocate for the Town, and wished to promote its interests, he did nothing to suggest a lack of care, a loss of objectivity, or any other basis for discrediting him. Moreover, and more importantly, his input, though in part legal and analytical, did not constitute the giving of legal advice to a client. Instead, it was a lawyer-to-lawyer communication designed principally to describe facts uncovered in the Town's investigation, and to a lesser degree to suggest the most appropriate procedure by which Summit could join in the Town's claim for injunctive relief. Even, then, if Mr. Alair had been less than objective in his assessment of the situation as it affected Summit, and there is no evidence that he was, the final responsible party in the advice-giving process was Attorney Greenberg.
The same, of course, is true of Attorney Slez. His conversations with Attorney Greenberg, after his detailed review of the Town's Complaint with Attorney Alair, were to all appearances thorough, professional, and factual. He did nothing to dissuade Attorney Greenberg from conducting her careful review of the relevant facts. To the contrary, he suggested by his conduct that just such a review was absolutely necessary before meaningful advice could be given, and in all other respects showed the kind of care and objectivity that fully justified relying upon him. Here again, however, as with Attorney Alair, Attorney Slez was merely a source of information and advice for Attorney Greenberg before she personally counselled Summit, through Ms. Montgomery, as to how it should proceed.
In sum, the lawyer to whom Summit turned in making its CT Page 5054 initial decision to intervene was the sort of person from whom the defendant could reasonably turn for an accurate, impartial opinion as to the viability of Summit's claim against these plaintiffs. She had no ax to grind in this matter and did not do so. Her careful, facially neutral advice was reasonably and appropriately followed.
Fourth, as previously noted, the defendant did follow Attorney Greenberg's sound advice.
And fifth, for the reasons fully spelled out above, in the Court's discussion of malice, it followed such advice in consummate good faith, having had no hidden agenda that undermined its objectivity, no ulterior motives in pursuing the intervention, and no basis for doubting that the advice was honest, complete and correct. Reluctantly, but with full and reasonable assurance that it was well within its rights to do so, Summit intervened in the Town's action, naming these plaintiffs as parties defendant therein. Summit's conduct in so doing was an act of self-preservation in the face of threatened future disruptions, fully justified by the careful, competent advice of legal counsel. For that reason, it has a complete defense to the instant action for vexatious suit.
In consequence of the foregoing findings, the Court enters judgment for the defendant on the plaintiffs' claim of vexatious suit.
Abuse of Process
 Elements
"An action for abuse of process lies against any person using a legal process against another in an improper manner or to accomplish a purpose for which it was not designed." Mozzochi v.Beck, 204 Conn. 490, 494 (1987).
Analysis
The defendant here claims that the plaintiffs brought this action for vexatious suit hoping that a judgment in their favor would offset any judgment they owe the defendant for attorney's fees in their failed federal civil rights action. The plaintiffs dispute this contention, claiming that the true and proper purpose for which they this case was to restore their good name CT Page 5055 and to recover damages for the humiliation, annoyance and expense they suffered as a result of the defendant's joinder of the Town's federal RICO action.
The Court has found as a matter of fact that the plaintiffs' explanation for the filing this lawsuit action is accurate. The Court believes that John M. Spear honestly felt and feels wronged by the defendant's conduct in naming his and his company defendants in the Town's underlying action, and that he filed this action to be vindicated for the writing of what he honestly believed to be an accurate editorial based on what he had been told.
In consequence of the foregoing findings, the Court enters judgment for the plaintiffs on the defendant's counterclaim.
HON. MICHAEL R. SHELDON, J.